UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | | |
|---|---|---|
| CASIMIR L. LEBEAU, CLARENCE MORTENSON, RAYMOND CHARLES HANDBOY, SR., and FREDDIE LEBEAU, on behalf of themselves and all other persons similarly situated, | ) ) ) ) ) ) ) ) | CIV. 12-4178-KES<br><br>ORDER GRANTING DEFENDANT'S MOTION TO DISMISS |
| Plaintiffs, | ) ) | |
| vs. | ) ) | |
| UNITED STATES OF AMERICA, | ) ) | |
| Defendant. | ) | |

Plaintiffs brought suit against the United States alleging claims for breach of trust obligations, breach of fiduciary duty, and accounting. The relief sought by plaintiffs is limited to declaratory and equitable relief. The United States moves to dismiss plaintiffs' complaint in its entirety, arguing plaintiffs lack standing, among other things. Plaintiffs resist the motion. For the following reasons, the motion is granted, and plaintiffs' claims are dismissed without prejudice.

**BACKGROUND**

The facts, according to the complaint (Docket 1), are as follows:

Nearly seventy years ago, Congress authorized the Army Corps of Engineers to construct the Oahe Dam and Reservoir. Construction of the dam required the Army Corps of Engineers to flood approximately 370,000 acres of

land in South Dakota and North Dakota. The Cheyenne River Sioux Tribe and individual members of the Tribe owned 104,492 acres of the land—the individual members owning approximately 46,275 acres.

Over 180 families—30 percent of the tribal population—were forced to leave their homes and sever the cultural connection they had to the land due to the flooding. In 1954, Congress passed an act to provide compensation to both the Tribe and the individual Indian land owners (the 1954 Act) for the taking of their lands.

In 2000, Congress passed the Cheyenne River Sioux Equitable Compensation Act (the Act). The Act recognized that the United States did not fairly compensate the Tribe when the government acquired the 104,492 acres of land for the Oahe Dam and Reservoir project. To make amends, the Act established a trust fund—the Cheyenne River Sioux Tribal Recovery Trust Fund—to be managed by the Secretary of the Treasury in order to make payments to the Tribe to carry out projects under a plan prepared by the Tribe. Beginning in 2011, the Secretary of the Treasury was required to withdraw the aggregate amount of interest deposited into the trust fund for the fiscal year and transfer that amount to the Secretary of the Interior to make payments to the Tribe. In 2011, the first disbursement of interest from the trust fund established under the Act occurred. The Secretary of the Interior disbursed the entirety of the interest to the Tribe.

Plaintiffs are individual members of the Cheyenne River Sioux Tribe. All are either a previous individual owner or an heir of a previous individual owner of land that was taken by the United States for the building of the Oahe Dam and Reservoir. Plaintiffs claim the United States holds money in trust for them under the Act and failure to safeguard their portion of the trust assets will deprive them of just compensation for the taking of their land under the Act. Plaintiffs also claim that the United States owes them a fiduciary duty to distribute a portion of the trust funds to them. By not disbursing a portion of the trust funds directly to plaintiffs and other individual land owners, plaintiffs argue the United States breached trust and fiduciary duties owed to plaintiffs. Plaintiffs also claim they are entitled to an accounting.

## DISCUSSION

### I. Standing

The United States argues plaintiffs do not have standing to bring their claims. Standing "is a jurisdictional prerequisite that must be resolved before reaching the merits of a suit." *City of Clarkson Valley v. Mineta*, 495 F.3d 567, 569 (8th Cir. 2007). "[I]f a plaintiff lacks standing, [a] district court has no subject matter jurisdiction. Therefore, a standing argument implicates Rule 12(b)(1)." *Faibisch v. Univ. of Minn.*, 304 F.3d 797, 801 (8th Cir. 2002). In analyzing the standing issue, the court must accept all factual allegations in the complaint as true and draw all inferences in plaintiffs' favor. *Young Am. Corp. v. Affiliated Computer Servs. (ACS), Inc.*, 424 F.3d 840, 843 (8th Cir.

2005). "Standing requires (1) an injury that is concrete and particularized and actual or imminent, not conjectural or hypothetical, (2) that the injury be fairly traceable to the challenged action of the defendant, and (3) that it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." *Turkish Coal. of Am., Inc. v. Bruininks*, 678 F.3d 617, 621 (8th Cir. 2012).

The United States argues plaintiffs lack standing because they are not a party to the trust relationship that exists between the United States and the Tribe under the Act, and therefore plaintiffs cannot establish an injury in fact. Plaintiffs, on the other hand, claim they are a party to the trust relationship under the Act and are entitled to portions of the funds. By not receiving any disbursements, plaintiffs claim they have an injury that is actual, concrete, and particularized. The issue then turns on whether plaintiffs, in their individual capacities, are entitled to any of the funds held in trust under the Act.

Whether plaintiffs are entitled to any funds under the Act is a question of statutory interpretation. "The preeminent canon of statutory interpretation requires [the court] to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United States*, 541 U.S. 176, 183 (2004) (quotations omitted). "Thus, [the court's] inquiry begins with the statutory text, and ends there as well if the text is unambiguous." *Id.* When interpreting the statute, the court examines the "text

4

of the statute as a whole by considering its context, object, and policy." *United States v. Allmon*, 702 F.3d 1034, 1036 (8th Cir. 2012).

### A. Plain Language

The "Purposes" section of the Act reads as follows:

> The purposes of this title are as follows:
>
> (1) To provide for additional financial compensation to the Tribe for the acquisition by the Federal Government of 104,492 acres of land of the Tribe for the Oahe Dam and Reservoir project in a manner consistent with the determinations of the Comptroller General described in subsection (a)(4).
>
> (2) To provide for the establishment of the Cheyenne River Sioux Tribal Recovery Trust Fund, to be managed by the Secretary of the Treasury in order to make payments to the Tribe to carry out projects under a plan prepared by the Tribe.

Cheyenne River Sioux Tribe Equitable Compensation Act, Pub. L. No. 106-511, § 102(b), 114 Stat. 2365 (2000). Plaintiffs contend the plain language of the Act demonstrates that they, as individual land owners, are entitled to funds in the trust because Congress referred to the 104,492 acres in its entirety and plaintiffs' land was part of that 104,492 acres. Plaintiffs, however, gloss over the text that appears before and after the reference to the 104,492 acres and similarly ignore the remainder of the language of the Act.

As stated in the language above, the purpose of the Act was "to provide for additional financial compensation *to the Tribe*" by establishing a trust fund and having the Secretary of the Treasury "make payments *to the Tribe* to carry out projects under a plan *prepared by the Tribe*." *Id.* (emphasis added).

5

Congress defined "Tribe" to mean "the Cheyenne River Sioux Tribe, which is comprised of the Itazipco, Siha Sapa, Minniconjou, and Oohenumpa bands of the Great Sioux Nation that reside on the Cheyenne River Reservation, located in central South Dakota." *Id.* at § 103(1). The Cheyenne River Sioux Tribe is, and was at the time the Act was passed, a federally recognized tribe. Indian Entities Recognized and Eligible to Receive Services from the United States Bureau of Indian Affairs, 65 Fed. Reg. 13298-01 (Mar. 13, 2000). *See also United States on behalf of Cheyenne River Sioux Tribe v. South Dakota*, 105 F.3d 1552, 1555 (8th Cir. 1997) ("The Cheyenne River Sioux Tribe is a federally recognized Indian tribe."). Tribes are entities distinct from their individual members, and tribal property interests are held by the tribe, not the individual members. *See, e.g., United States v. Jim*, 409 U.S. 80, 82 (1972) ("It is settled that whatever title the Indians have is in the tribe, and not in the individuals, although held by the tribe for the common use and equal benefit of all the members.") (internal quotations omitted); *Short v. United States*, 12 Cl. Ct. 36, 42 (1987) ("[I]ndividual Indians do not hold vested severable interests in unallotted tribal lands and monies as tenants in common."); *Holt v. Comm'r of Internal Revenue*, 364 F.2d 38, 41 (8th Cir. 1966) ("No individual Indian has title or an enforceable right in tribal property."). There is no doubt that Congress was aware of this distinction when it drafted the Act and thus, by

defining "Tribe" to mean the Cheyenne River Sioux Tribe, intentionally did not include the individual members as beneficiaries of the trust fund.[1]

Congress's conscious choice to hold the trust funds for the benefit of the Tribe itself, and not for the individual land owners, is evidenced further by the remaining language in the Act. In the section of the Act that sets up the trust fund, Congress mandated that the Secretary of the Interior was to make transfers of trust funds "only for the purpose of making payments to the Tribe, as such payments are requested by the Tribe pursuant to tribal resolution." Pub. L. No. 106-511 § 104(d)(2)(A). Plaintiffs admit individual tribal members cannot make tribal resolutions. Docket 20 at 25. Thus, even under plaintiffs' reading of the Act, the Tribe, pursuant to a tribal resolution, would need to request payments for the individual land owners. Such an arrangement makes little sense, however, because the Tribe and the individual land owners would be competing against each other for the limited amount of money in the trust fund. Any money distributed to the Tribe would become unavailable to the individual land owners and vice versa. The Tribe would have little incentive to request payments for the individual land owners. If Congress intended

---

[1] Indeed, Congress distinguished between the Tribe and individual members within the Act. Section 105 of the Act states, "No payment made to the Tribe under this title shall result in the reduction or denial of any service or program with respect to which, under Federal law (1) the Tribe is otherwise entitled . . . ; or (2) any individual who is a member of the Tribe is entitled because of the status of the individual as a member of the Tribe." This section indicates that Congress was well aware tribes and their members are separate, distinct entities capable of having separate, distinct entitlements.

plaintiffs to receive payments under the Act, it would be nonsensical to impose such a barrier on receiving those payments.

Moreover, Congress mandated that payments can only be made to the Tribe "after the Tribe has adopted a plan" and can only be used "for carrying out projects and programs under the plan." *Id.* at § 104(d)(2). Expended payments under a plan must promote "(A) economic development; (B) infrastructure development; (C) the educational, health, recreational, and social welfare objectives of the Tribe and its members; or (D) any combination of the activities described in subparagraphs (A) through (C)." *Id.* at § 104(f)(2). This language indicates that Congress intended to place specific limitations on how payments to the Tribe could be spent by the Tribe. These limitations share a common goal: promoting the overall welfare of the Tribe and its members.

It would be unreasonable to place these limitations on money going directly to individuals. First, the magnitude of the limitations would make it difficult for a single individual to satisfy them. For example, it is unlikely a single person is both capable and willing to spend a substantial amount of money to promote infrastructure development. Second, ensuring each individual land owner who received funds complied with the terms of the Act would be difficult to oversee. The Act includes an audit process in which the activities of the Tribe in carrying out the plan are audited as part of a preexisting annual auditing process. Pub. L. No. 106-511 § 104(4). Under plaintiffs' interpretation, an entirely new auditing process would have to be

created because each individual land owner would need to be audited to ensure compliance with the spending limitations. But there is no mention of any individualized auditing process found in the Act. When read as a whole, it is evident that Congress directed the payments go to the Tribe only and not to the individual land owners because the Tribe is in a better position to promote the overall welfare of the Tribe and its members.

In sum, the plain language of the Act is clear that the Tribe is the only direct beneficiary of the trust fund set up under the Act. The individual land owners are not entitled to any direct payment out of the trust fund. Although Congress referenced the 104,492 acres in its entirety, which included the individual land owners' land, the Act as a whole is unambiguous in directing payments solely to the Tribe. *See Owner-Operator Indep. Drivers Ass'n, Inc. v. Supervalu, Inc.*, 651 F.3d 857, 863 (8th Cir. 2011) ("In determining whether statutory language is plain and unambiguous, the court must read all parts of the statute together and give full effect to each part.").

### B. Legislative History and Other Statutes

Although looking beyond the plain language of the statute here is unnecessary due to the unambiguous language of the Act, such an examination provides additional evidence of Congress's intent. *See Owner-Operator*, 651 F.3d at 866 ("[T]he goal of statutory analysis, of course, is to give effect to the Congressional intent behind the statute's enactment.").

9

Plaintiffs argue the 1954 Act, which provided the initial compensation for the United States's taking of the 104,492 acres, supports their reading. The 1954 Act provided compensation to both the Tribe and the individual land owners. Act of Sept. 3, 1954, ch. 1260, Pub. L. No. 776 § II, 68 Stat. 1191; *see also Cheyenne River Sioux Tribe of Indians v. United States*, 338 F.2d 906, 907-08 (8th Cir. 1964) (explaining the 1954 Act). The 1954 Act required the government to pay out the sum of $5,384,014, which was deposited to the credit of the Tribe in the Treasury of the United States. *Id.* The Tribe was then "required to distribute the sum of $2,250,000 to individual Indian owners in accordance with the appraisals of the individual properties." *Cheyenne River*, 338 F.2d at 908. If an individual member was unsatisfied with the appraised value, he or she could reject the appraisal, and the government would then be required to initiate a type of condemnation proceeding in which the specific land that was taken would get an individual appraisal performed under court scrutiny. Pub. L. No. 776 § XV.

Because the 1954 Act provided for compensation to individual land owners, plaintiffs argue that Congress intended to provide additional compensation to the individual owners under the Act. The court disagrees and finds the 1954 Act actually weighs against a finding for plaintiffs here. The 1954 Act demonstrates Congress's awareness that the lands taken for the Oahe project included lands owned by the Tribe as well as individual Indians. Due to this awareness and the intent to compensate the individual land owners

directly, Congress clearly articulated how the separate entities would be compensated. Turning to the legislation now in question, Congress was fully capable of using similar language in the Act but chose not to do so. This suggests Congress did so purposefully. *See Meghrig v. KFC Western, Inc.*, 516 U.S. 479, 485 (1996) (suggesting that when Congress has previously spoken to an issue in similar legislation, Congress's silence on the same issue in new legislation is purposeful).

The White Earth Reservation Land Settlement Act of 1985 (the "White Earth Act") provides another example of how Congress, when it intends to directly provide specific benefits to individual Indians, knows how to use statutory language to differentiate between the Tribe and the individual Indians. Pub. L. No. 99–264, 100 Stat. 61. The White Earth Act was enacted to settle unresolved claims relating to certain Indian lands on the White Earth Indian Reservation by compensating both individual Indian land owners as well as the tribe itself. In doing so, Congress distinguished the White Earth Band itself from the individual Indians within the band. Pub. L. No. 99–264 §§ 2, 6, 7, 8, 12. This shows that had Congress intended to compensate the individual land owners under the Act, it would not have done so in the cryptic fashion plaintiffs suggest.

Plaintiffs also direct the court to the Act's legislative history in defense of their position. But the legislative history is of little help to plaintiffs because there is no indication that Congress sought to compensate the individual land

owners under the Act. H.R. Rep. No. 106-944 (2000); S. Rep. No. 106-217 (1999). Instead, the legislative history discusses the negative impact the Oahe project had on the Cheyenne River Sioux Tribe as a whole. *See, e.g.*, S. Rep. No. 106-217, at 2 (stating that "104,492 acres of tribal lands had been inundated, and 181 families (30% of the tribal population) had been forced to relocate. . . . The [Cheyenne River Sioux Tribe] lost some 90% of its timber. . . . The bottom lands provided the [Cheyenne River Sioux Tribe] a source of potable water. . . . The losses suffered by the Tribe were keenly felt"). Thus, the legislative history goes hand in hand with the plain language of the Act—Congress intended the trust funds to be paid solely to the Tribe itself.

Congress's actions following passage of the Act further demonstrate that it did not intend to include the individual land owners as beneficiaries under the Act. On two separate occasions Congress attempted to amend the Act "to provide compensation to members of the Cheyenne River Sioux Tribe for damage resulting from the Oahe Dam and Reservoir Project[.]" Cheyenne River Sioux Tribe Equitable Compensation Amendments Act of 2005, S. 1535, 109th Cong. (2006); Cheyenne River Sioux Tribe Equitable Compensation Amendments Act of 2007, H.R. 487, 110th Cong. (2007). Both attempted amendments sought to provide additional compensation to the very individual land owners that are the plaintiffs in this action. Indeed, both attempted amendments included a reference to the Act, stating that the Act "did not provide for additional compensation to members of the Cheyenne River Sioux

12

Tribe that lost land as a result of the Oahe Dam and Reservoir Project." S. 1535 § 2(a)(6); H.R. 1535 § 2(a)(6). Neither amendment was passed. While later congressional action is not conclusive proof of prior Congressional intent, it has some probative value.

After a thorough review of the plain language of the Act, its legislative history, and other similar statutes, the court finds Congress intended for the Tribe to be the sole beneficiary of the trust fund created under the Act. Because plaintiffs are not a party to the trust relationship that was created by the Act, they are unable to establish a concrete and particularized injury and thus lack standing to bring an action under the Act. *See Hoopa Valley Tribe v. United States*, 597 F.3d 1278, 1284 (Fed. Cir. 2010) ("[E]ntitlement to the Settlement Fund is dictated by the provisions of the Act itself, and Hoopa Valley received all of the money to which it was entitled under the Act. Thus the Hoopa Valley Tribe cannot show an injury in fact based on DOI's distribution.").

## II.  Breach of Trust and Fiduciary Duty Claims Separate from the Act

Plaintiffs argue they pleaded actionable claims for breach of trust and breach of fiduciary duty even if the Act does not provide compensation to the individual land owners. The complaint asserts three counts against the United States: (1) Breach of Trust Obligations; (2) Breach of Fiduciary Duty; and (3) Accounting–Declaratory Judgment. Docket 1 at 13-15. After reviewing plaintiffs' complaint, the court disagrees with plaintiffs' contention that they

13

pleaded additional breach of trust and breach of fiduciary duty claims separate from those allegedly arising under the Act.

In asserting their claim for breach of trust obligations, plaintiffs state, "Through the [Cheyenne River Sioux Equitable Compensation Act], the United States holds monies in trust for the benefit of individual tribal members. Implicit within the [Cheyenne River Sioux Equitable Compensation Act] is the establishment of a trust relationship between Defendant and the Individual Landowners and their heirs." Docket 1 at 13. This is the extent of plaintiffs' pleadings with respect to the existence of a trust relationship between them and the United States. The court already determined the Act does not create any interests or benefits for plaintiffs. Likewise, the Act does not establish a trust relationship between plaintiffs and the United States. Plaintiffs did not plead the existence of a trust relationship arising from something other than the Act and therefore failed to plead a breach of trust obligation claim separate from the one already analyzed by the court.

Plaintiffs' breach of fiduciary duty claim also arises solely from the Act. The complaint states:

> 44. Defendant owes a fiduciary duty to the Individual Landowners and their heirs because the Trust Fund, created by the [Cheyenne River Sioux Equitable Compensation Act], contains monies held in trust for the purpose of compensating for taking 104,492 acres in 1948[.]
>
> . . . .

46. Because of the control exercised by the United States over the Trust, common law trust elements apply. . . . The United States serves as trustee to the Individual Landowners, who are beneficiaries to a corpus: the Trust Fund monies.

47. . . . By disbursing Trust Fund monies only to the Tribe . . . Defendant has violated its fiduciary duty to the Individual landowners and their heirs.

Docket 1 at 14-15. For the same reasons plaintiffs did not plead a claim for breach of trust separate from the Act, plaintiffs failed to plead a claim for breach of fiduciary duty separate from their claim arising under the Act.

The court is sympathetic to plaintiffs' claims here. Assuming the facts in the complaint are true, Congress has essentially admitted that it did not provide adequate compensation to the plaintiffs when it took their lands roughly seventy years ago. But as discussed above, the Act does not provide plaintiffs an avenue for redress in federal district court. If plaintiffs believe they are entitled to additional compensation, they should go to Congress for that compensation. Accordingly, it is

ORDERED that defendant's motion to dismiss (Docket 16) is granted, and plaintiffs' claims are dismissed without prejudice.

Dated September 5, 2013.

BY THE COURT:

/s/ *Karen E. Schreier*
KAREN E. SCHREIER
UNITED STATES DISTRICT JUDGE